# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN

---

NANCY C. LEHMAN,

                          **Plaintiff,**

      v.                                  **Case No. 03-C-234**

UNUM LIFE INSURANCE COMPANY OF AMERICA,

                          **Defendant.**

---

## DECISION AND ORDER

---

      This matter comes before the Court for a Trial on the Administrative Record pursuant to Federal Rule of Civil Procedure 52(a).  Nancy Lehman ("Lehman") has brought claims against UNUM Life Insurance ("UNUM") under ERISA regarding the denial of her claim for disability benefits.  For the reasons that follow, the Court finds that Lehman is not entitled to benefits under the Policy, and judgment shall be entered accordingly.

## FACTUAL BACKGROUND[1]

      Ms. Lehman was born on June 14, 1943.  (Plaintiff's Proposed Findings of Fact ["PPFF"], ¶¶ 1, 5).  (PPFF, ¶ 6).  She received her Registered Nursing Degree from Milwaukee County Hospital of Nursing.  Lehman was employed as a surgical staff nurse from 1964-1989 at Froedtert Memorial Lutheran Hospital, West Allis Memorial Hospital, St. Francis Hospital and St. Anthony Hospital.  (PPFF, ¶ 7).  Lehman was then employed as a nursing staff manager at Managed Health Services Insurance Corp. from 1989-1995.

---

[1]  The findings of fact are derived from the administrative record compiled by defendant in the administration of plaintiff's claim.  *See* August 12, 2004 Order, ¶ 2; Exhibit A to Affidavit of Holly Harwell, bates stamp numbers UACL 00001-UACL00216 [Docket # 18].

(PPFF, ¶ 8). After that, plaintiff worked as a Case Manager for United Wisconsin Services from 1995 until 1999. (PPFF, ¶ 9).

On June 6, 1999, Lehman began working at the Village of Manor Park ("Manor Park") as the Director of Case Management/Social Services. (PPFF, ¶ 10). Lehman's primary responsibilities were supervision of 5-6 nurses and/or social workers. (Defendant's Proposed Findings of Fact ["DPFF"], ¶ 18). Lehman's job duties during the day involved sitting, standing, walking and balancing alternately in variable intervals. (PPFF, ¶ 12). Her annual salary was $55,000. (PPFF, ¶ 13).

## I. The Policy

UNUM issued Group Policy No. 552745 001 (the "Policy") to Manor Park. (PPFF, ¶ 14). The Policy provides the following regarding an initial determination of disability:

You are disabled when UNUM determines that:

- you are **limited** from performing the **material and substantial duties** of your **regular occupation** due to your **sickness or injury**; and

- you have a 20% or more loss in your **indexed monthly earnings** due to the same sickness or injury;

(PPFF, ¶ 15) (emphasis in original).

The "certificate section" of the Policy states: "[w]hen making a benefit determination under the Policy, UNUM has discretionary authority to determine your eligibility for benefits and to interpret the terms and provisions of the policy." (PPFF, ¶ 16). The certificate section also states: "If the terms and provisions of the certificate of coverage

(issued to you) are different from the policy (issued to the policyholder), the policy will govern." (PPFF, ¶ 17).

The Policy defines "regular occupation" as "[t]he occupation you are routinely performing when your disability begins. UNUM will look at your occupation as it is normally performed in the national economy, instead of how the work tasks are performed for a specific employer or at a specific location." (PPFF, ¶ 18). "Material and substantial duties" are duties that:

- are normally required for the performance of your regular occupation; and

- cannot be reasonably omitted or modified, except that if you are required to work on average in excess of 40 hours per week, UNUM will consider you are able to perform that requirement if you are working or have the capacity to work 40 hours per week.

(PPFF, ¶ 19).

## II.  Lehman's Medical Treatment

Plaintiff first sought treatment for arthritis in February of 1999. (PPFF, ¶ 27). Lehman informed her treating physician, Dr. Mark Pearson, M.D. ("Dr. Pearson"), that her symptoms began appearing in December of 1998. (PPFF, ¶ 28). Dr. Pearson is a board certified Rheumatologist. (PPFF, ¶ 29).

At first, Lehman suffered from acute pain in the right wrist, and then the left wrist. (PPFF, ¶ 30). Subsequently, Lehman began suffering from pain involving both hips, the cervical spine, and the right knee. (PPFF, ¶ 31). Dr. Pearson's initial impression was that Lehman suffered from inflammatory arthritis. (PPFF, ¶ 32). Dr. Pearson scheduled a

Case 2:03-cv-00234-RTR   Filed 09/26/06   Page 3 of 23   Document 41

follow-up to confirm this diagnosis. (PPFF, ¶ 33). On February 16, 1999, Dr. Pearson placed Lehman on a regimen of pain medication, including prednisone. (PPFF, ¶ 34).

On April 9, 1999, Lehman saw Dr. Pearson and reported that she had a dramatic flare-up of her symptoms and began taking more prednisone, which offered temporary relief. (PPFF, ¶ 36). On May 19, 1999, Lehman saw Dr. Pearson and reported that she continued to have flares of joint pain and night sweats. After placing Lehman on methotrexate, Dr. Pearson reported that Lehman felt "dramatically better" within a week or two. (PPFF, ¶ 37).

On July 12, 1999, Lehman saw Dr. Pearson because she was having episodic flare-ups of pain involving her left shoulder and right ankle. (PPFF, ¶ 38). On October 6, 1999, Lehman saw Dr. Pearson and, although she was "feeling fairly well," she still was suffering from episodic aches and pains. (PPFF, ¶ 39). Lehman saw Dr. Pearson on January 5, 2000, and reported suffering from aches and pains, mainly involving her ankles and wrists. Dr. Pearson noted that Lehman's symptoms lasted "one to two days." (PPFF, ¶ 40). A note by Dr. Pearson dated February 14, 2000 indicates that Lehman had suffered a flare-up, with a "lot of fatigue, six swollen joints, and a low grade fever within a week of that date." (PPFF, ¶ 41).

On February 23, 2000, plaintiff saw Dr. Pearson who reported that Lehman "has had a severe flare in her arthritis" and was "unable to make a fist." Plaintiff also suffered from "significant swelling over the volar aspect of both hands." After increasing her dosage of prednisone, Lehman reported doing better. (PPFF, ¶ 42). Dr. Pearson "discussed stress being a contributing factor, especially at work." (PPFF, ¶ 43).

On May 5, 2000, plaintiff saw Dr. Pearson who reported that Lehman "was doing well other than fatigue," and that the arthritis was "under good control with low-dosage prednisone and methotrexate." However, Dr. Pearson noted that Lehman had "tapered her prednisone down but when going off she had diffuse aches and pains typical of her inflammatory arthritis." (PPFF, ¶ 44). On July 6, 2000, Dr. Pearson increased Lehman's prescription of prednisone by 10 mg. (PPFF, ¶ 45).

On August 7, 2000, Dr. Pearson diagnosed Lehman with "Rheumatoid Arthritis" and noted that Lehman had a "flare-up arthritis-wise requiring 10 mg of prednisone with +/- (no) improvement." "She has been working long hours and has been under some stress which she thinks correlates. She did have some swelling of her left wrist, knee and shoulder." (PPFF, ¶ 45). On September 13, 2000, Dr. Pearson noted that Lehman had increased wrist swelling and increased her prednisone dosage by 20 mg. (PPFF, ¶ 47). On October 31, 2000, plaintiff saw Dr. Pearson who reported that plaintiff "had a flare involving her right wrist and left shoulder." He also reported: "[r]heumatoid arthritis doing well with high doses of methotrexate and low doses of prednisone." (PPFF, ¶ 48).

On December 22, 2000, plaintiff saw Dr. Jennifer Cool, M.D. ("Dr. Cool") who reported that plaintiff was "doing poorly arthritis-wise and has been on significant doses of prednisone and basically unable to work since December 12." "She was doing better and tapered the prednisone to 10 mg q.a.m. and has been taking high doses of Advil but, over the last day or so, developed severe pain in her left shoulder and wrist." (PPFF, ¶ 49; DPFF, ¶ 23). Dr. Cool opined that "we're dealing with tenosynovitis here on an inflammatory

basis." The remainder of the joint exam was unremarkable. (DPFF, ¶ 23). Dr. Cool recommended she take a leave of absence from work as "she is fairly debilitated and fatigued and clearly has inflammatory arthritis." (PPFF, ¶ 50). On December 30, 2000, Dr. Pearson noted increased aches and pains. (PPFF, ¶ 51).

Plaintiff returned to work some time in January, 2001. (DPFF, ¶ 24). On January 22, 2001, plaintiff saw Dr. Cool for treatment with regard to her hypertension. The severity of plaintiff's hypertension was related to her prednisone dosage. Dr. Cool noted that Lehman suffered from headaches, fever and chills, night sweats, weight gain, heartburn, nausea, vomiting, diarrhea, hemorrhoids, high blood pressure, and joint swelling. (PPFF, ¶ 53). Dr. Cool did not identify fatigue or pain in this visit, nor did she identify an inability to perform her occupational duties. Dr. Cool did not restrict plaintiff from working. (DPFF, ¶ 25).

On January 24, 2001, plaintiff saw Dr. Pearson, who reported that although Lehman was back at work, she still had pain and swelling in her hips, left shoulder, and hands, and was "having some difficulty at work." "She has pain with extreme internal and external rotation of her left shoulder." (PPFF, ¶ 54). Dr. Pearson's diagnosis was that plaintiff had "[d]efinite inflammatory arthritis with some disease activity, apparently better with medications." (PPFF, ¶ 55). However, Dr. Pearson found good mobility and range of motion in plaintiff's wrists and fingers, despite slight puffiness. (DPFF, ¶ 25). Dr. Pearson did not provide restrictions or limitations on plaintiff's ability to perform her job duties. (*Id.*)

On February 5, 2001, Lehman worked her last day at Manor Park due to her Rheumatoid Arthritis and began receiving salary continuation benefits for the period of February 7, 2001 through July 4, 2001. (PPFF, ¶ 56).

On February 19, 2001, plaintiff saw Dr. Pearson who reported that Ms. Lehman's "major problem has been fatigue" and that she was experiencing "flare-ups." (PPFF, ¶ 57). Nonetheless, Dr. Pearson's exam revealed "excellent mobility of all peripheral joints without synovitis." Dr. Pearson did not place work or recreational restrictions on plaintiff's activities. (DPFF, ¶ 26).

On April 16, 2001, plaintiff saw Dr. Pearson who reported that Lehman was "doing poorly over the last several months." He reported that Lehman was "sleeping poorly with maybe 4 hours of sleep and has been unable to work. Any activities cause severe exhaustion." He also reported that Lehman's rheumatoid arthritis was doing fairly well at the time, "the majority of her symptoms now sound Fibromyalgia." (PPFF, ¶ 58).

On May 29, 2001, Lehman saw Dr. Cool who reported that plaintiff's arthritis was active and that plaintiff "is still stiff enough that she feel[s] like she cannot work." (PPFF, ¶ 59). Dr. Cool also noted that Lehman "suffers from Fibromyalgia" and is taking varying amounts of medication for it "depending on how bad she feels that day." (PPFF, ¶ 60). However, Dr. Cool indicates no testing or evaluation of plaintiff's ability to perform her occupational duties. (DPFF, ¶ 28). On June 20, 2001, plaintiff saw Dr. Pearson who diagnosed Ms. Lehman with Rheumatoid Arthritis, plitive ANA, and Fibromyalgia. Dr.

Pearson reported that Ms. Lehman was "having increased aches and pains." Dr. Pearson also stated that Ms. Lehman was having problems with fatigue. (PPFF, ¶ 61).

## III. Plaintiff's Claim for Benefits

On or about June 27, 2001, plaintiff submitted a claim for long-term disability (LTD) benefits to UNUM. (PPFF, ¶ 62). When she filed the claim, plaintiff stated that her last day of work was February 6, 2001. (PPFF, ¶ 63). Dr. Cool submitted a Physician's Statement along with the claim. (PPFF, ¶ 64). In the Physician's Statement, Dr. Cool stated that she believed that the last day plaintiff was able to work was February 5, 2001. (PPFF, ¶ 65). Dr. Cool listed the primary diagnosis as rheumatoid arthritis, with Fibromyalgia as a secondary condition contributing to the disability. (PPFF, ¶ 66). Dr. Cool stated that plaintiff's symptoms first began appearing on February 2, 1999. (PPFF, ¶ 67; DPFF, ¶ 20). Dr. Cool stated that plaintiff was having flares in different joints at different times, and that pain limits movement in the affected joints. (PPFF, ¶ 68; DPFF, ¶ 21). Dr. Cool also stated that plaintiff's endurance is limited, and that her prognosis for recovery is poor. (PPFF, ¶ 69; DPFF, ¶ 21).

As part of her claim for benefits, plaintiff submitted information about her occupational duties. Reginald M. Hislop III ("Hislop"), the President of the Village at Manor Park, provided this information. (PPFF, ¶ 70). According to Hislop, plaintiff's duties included supervising 5-6 nurses and/or social workers plus administrative assistants, one to one contact, telephone contact, personal observation, and in-person oral instruction. (PPFF, ¶ 71). Hislop noted that 100% of plaintiff's activity during the day involved sitting,

standing, walking and balancing alternately in variable intervals. (PPFF, ¶ 72). He also noted that plaintiff frequently climbed 20 stairs and pushed up to 50 lbs. (PPFF, ¶ 73).

On August 1, 2001, UNUM Customer Care Specialist Clara Ross ("Ross") conducted a telephone interview with plaintiff. (PPFF, ¶ 74). During the interview, Lehman documented that she is unable to drive, get dressed, or brush her teeth, and has difficulty bathing. (PPFF, ¶ 75). Lehman also stated that all of her fingers were inflamed and that she did not have the ability in her upper body to do lifting. (PPFF, ¶ 76). She stated that her job required long hours, was stressful, and required her to be on call 24 hours a day. (PPFF, ¶ 77). She also stated that she did not have the stamina to work an eight-hour day. (PPFF, ¶ 78). Plaintiff noted that her blood pressure was extremely high from the medication she was taking for her arthritis. (PPFF, ¶ 79). On August 1, 2001, Lehman also reported to Dr. Pearson, who instructed her to increase her dosage for prednisone. Lehman also told Dr. Pearson that she could not move her fingers and was experiencing pain in her shoulders and elbows. (PPFF, ¶ 80).

UNUM sought and obtained further information about plaintiff's occupational duties from Manor Park. (PPFF, ¶ 81). Among the "essential functions" were the ability to stand, sit, and walk varying by one hour increments, as well as the ability to walk up to one quarter of a mile without resting or stopping. (PPFF, ¶ 82). It was also noted that plaintiff's job required long hours, up to ten hours per day five days per week. (PPFF, ¶ 83). However, UNUM's consultant determined that plaintiff's occupation was primarily sedentary in nature with frequent lifting and moving up to 20 pounds. (DPFF, ¶ 31).

On August 29, 2001, UNUM submitted plaintiff's medical records to an in-house physician known as "Dr. Beecher" for the purpose of determining whether the "information in Dr. Pearson's records support diagnosis and restrictions and limitation for Rheumatoid Arthritis?" (PPFF, ¶ 85). Dr. Beecher reviewed Lehman's medical records for the period of "January, 2001 through June, 2001" and concluded that there was "little to support any synovitis over this period of time" and "no medical (physical) condition documented to support any impairment." (PPFF, ¶ 86). Dr. Beecher noted that plaintiff's main complaint appeared to be myofacial pain. (DPFF, ¶ 30). Dr. Beecher never examined Lehman, never interviewed Lehman or contacted her treating physicians, Dr. Cool or Dr. Pearson. (PPFF, ¶ 87). There is no information in the claim file as to Dr. Beecher's full name, office address, area(s) of specialty, or whether he or she is a health care professional with appropriate training and experience in the field of rheumatology. (PPFF, ¶ 88).

UNUM denied plaintiff's claim for LTD benefits on September 6, 2001. (PPFF, ¶ 92). That same day, UNUM sent plaintiff a denial letter. (PPFF, ¶ 93). The letter states: "Our medical consultant reviewed the available medical information and based on this review there is little objective medical evidence to support your symptoms. There is no physical medical condition documented to support impairment from a sedentary to light occupation." (PPFF, ¶ 94). UNUM reasoned that aside from the May 2001 Physician's Statement from Dr. Cool, offered months after plaintiff left work, plaintiff's treating physicians did not indicate that her rheumatoid arthritis was so severe as to disable her. (DPFF, ¶ 32). Plaintiff's treating physicians failed to place any contemporaneous

restrictions and limitations on her ability to perform her occupational duties. In particular, UNUM noted that plaintiff's January 22, 2001 examination was essentially normal, and a subsequent examination on February 26, 2001 indicated that she was medically stable. (DPFF, ¶ 32). The denial letter further states: "If you have new, additional information to support your request for disability benefits, please send it to my attention at the address noted on this letterhead . . . your written appeal should include your comments and views of the issues, as well as any new documentation you may wish us to consider." (PPFF, ¶ 103).

By letter dated November 15, 2001, Lehman filed an administrative appeal of the denial of her benefits which was acknowledged by UNUM on December 3, 2001. (PPFF, ¶ 105). On December 15, 2001, Lehman forwarded a Physical Residual Functional Capacity Questionnaire (RFC) completed by Dr. Pearson on November 26, 2001. (PPFF, ¶ 106). Dr. Pearson indicated in the RFC that Lehman's diagnosis was Rheumatoid Arthritis and that her prognosis was "fair." Lehman's symptoms included "pain, stiffness, swelling of joints an fatigue." Lehman was noted to have pain in her "hands, knees, shoulders, and feet." Her pain was characterized as "episodic and severe." The clinical findings and objective signs included "synovitis, decrease ROM (range of motion) and altered grip." (PPFF, ¶ 107). Dr. Pearson indicated that Lehman's impairment had lasted and could be expected to last at least twelve months. Dr. Pearson stated that Lehman's pain and other symptoms were severe enough to "often" interfere with her attention and concentration. (PPFF, ¶ 108). Dr. Pearson also noted that Lehman was only capable of "low stress jobs" due to "stress flares" and "RA." (PPFF, ¶ 109). Lehman was noted to be limited to walking less than one city

block, sitting less than one hour, standing only 30 minutes and sitting/standing/walking less than two hours in an 8-hour period.  (PPFF, ¶ 110).  Dr. Pearson also stated in the RFC that Lehman "may require extended leave" and that she would likely be absent from work "about four days per month."  (PPFF, ¶ 111).  With respect to limitations on plaintiff's ability to work at a regular job on a sustained basis, Dr. Pearson concluded that Lehman had "episodic RA-documented on my exam-quite active since at least July 2001."  (PPFF, ¶ 112).

The additional information was submitted to Brenda Nunn, R.N.  ("Nunn").  On January 31, 2002, Ms. Nunn completed a "Clinical/Vocational Walk-in Form" in response to Dr. Pearson's RFC dated 11/26/01.  Ms. Nunn concluded that "[restrictions and limitation] provided [11/26/01] by rheumatologist Dr. Mark Pearson do not appear to support as [attending physician] did not include any office notes, physical therapy notes, FCE, diagnostic tests, etc.  A brief review of this file indicates the most recent clinical data on file is dated 6-20-01-thus, there is no data to support these revised [restrictions and limitations] and/or anything to alter Dr. Beecher's previous medical assessment that impairment from sedentary to light activities is not supported."  (PPFF, ¶ 113).  Ultimately, nothing in plaintiff's medical records supported revised restrictions and limitations which would contradict Dr. Beecher's previous medical assessment that plaintiff's restrictions and limitations were not so severe as to preclude her from sedentary and light activities in February 2001.  (DPFF, ¶ 35).

On February 27, 2002, Ms. Nunn performed a "clinical review" at the request of Kerry D. Howard, Senior Appeals Specialist.  Nunn's assignment was to review Dr.

Pearson's RFC and determine "whether the medical information on file supports the restrictions and limitations provided on the RFC." (PPFF, ¶ 115). Nunn concluded that the "limitations described in the RFC dated 11/26/01 were not supported by the OVN's (Office Visit Notes), the latest of which was dated 6/20/01. Ms. Nunn concluded that Dr. Pearson's updated Restrictions and Limitations were not supported from the date of diagnosis of February 8, 2001 as "neither sets of records indicate [Ms. Lehman] was taken out of work at that time." (PPFF, ¶ 117).

Nunn's conclusions were forwarded to Dr. Tony Hill, UNUM's Vice-President and Associate Medical Director. (PPFF, ¶ 121). Dr. Hill concluded, as did Ms. Nunn, that "[a]fter a complete review of the file, I felt that the limitations described in the functional capacities questionnaire dated 11/26/01 were not supported by the OVN's, the latest of which was dated 6/20/01." (PPFF, ¶ 122). Dr. Hill also indicated that he "spoke with Dr. Mark Pearson this morning," who felt that Lehman's "RA is 'very active.'" Dr. Hill "recommended contacting his office staff to get copies of any OVN's since June, 2001, and returning the file to me for further review." (PPFF, ¶ 124).

By letter dated March 27, 2002, UNUM again denied Lehman's claim for LTD benefits. (PPFF, ¶ 125). UNUM noted that the chart notes and treatment records provided by plaintiff's treating physicians did not support their conclusions. (DPFF, ¶ 39). In particular, the conclusions in Dr. Pearson's November 26, 2001 report were unsupported by any contemporaneous treatment or assessments. Treatment records two weeks prior to plaintiff's alleged date of disability indicated no abnormal findings except hypertension, and

-13-

the following two visits in February 2001 concerned hypertension and made no mention of any physical pain related to rheumatoid arthritis. (DPFF, ¶ 39). UNUM's denial letter concluded that "with no physical limitation noted in assessments of Jan. and Feb. 2001 noted to compare with those prescribed by [Dr. Pearson] on 11/26/01, it would be reasonable that [Ms. Lehman] could have developed symptoms by 11/26/01 but [these] were not noted at the time of the date of disability some nine months before. It appears [Ms. Lehman's] inability to work after the end of Feb. 2001 could be attributed more to recovery from hemorrhoid surgery than from exacerbation of RA." (PPFF, ¶ 126).

By letter dated April 12, 2002, Dr. Pearson provided UNUM with additional medical records for Ms. Lehman from January 2001 forward. (PPFF, ¶ 127). Dr. Pearson stated: "[o]ver the past year, I have seen Nancy Lehman frequently and she has demonstrated significant active rheumatoid arthritis." Dr. Pearson indicated that Ms. Lehman "has had limited range of motion of multiple joints and an altered grip strength as well as systemic symptoms from her flares." "Considering the last few visits, there is no doubt that Nancy Lehman has active rheumatoid arthritis and I do feel is disabled from seeking any gainful employment." (PPFF, ¶ 128).

On April 24, 2002, Ms. Lehman's claim file was assigned to Ms. Holly Harwell ("Harwell"), Senior Appeals Specialist. Ms. Harwell again submitted the claim file to Brenda Nunn and Dr. Hill for additional review. (PPFF, ¶ 128). On June 3, 2002, Ms. Nunn indicated, "[a]s noted previously, data has not shown the deterioration in EE's health status around DOD of 2/8/01 which precluded her from performing light exertional activities due

to rheumatoid arthritis when she had worked with this diagnosis previously." (PPFF, ¶ 129). Dr. Hill reviewed the file on June 6, 2002, and indicated that the new documentation from Dr. Pearson did not alter his earlier conclusion that Ms. Lehman was not disabled from "gainful employment" from 2/8/01. (PPFF, ¶ 130). According to Dr. Hill, "[n]ew notes from AP include 1/7/02, 3/8/02, and a letter dated 4/12/02. On 1/7/02, AP documented 'good mobility of peripheral joints with some puffiness, several PI joints.' On 3/8/02 he wrote, 'findings reveal proliferate changes, multiple PIP and first through third joints.' Impression was 'rheumatoid arthritis with significant activity.'" (PPFF, ¶ 131).

By letter dated June 7, 2002, UNUM denied Ms. Lehman's claim for LTD benefits for a third and final time: "based on all of the information we have contained in your client's file it appears that she does not meet the definition of Total Disability as it is outlined in her policy and her restrictions and limitations would not preclude her from performing the duties of a sedentary to light occupation." (PPFF, ¶¶ 134-35).

## ANALYSIS

The Court proceeds under Rule 52(a), which provides that in "all actions tried upon the facts without a jury or with an advisory jury, the court shall find the facts specially and state separately its conclusions of law thereon, and judgment shall be entered pursuant to Rule 58." This is the appropriate course of action in deciding a claim for benefits under ERISA. *See, e.g, Hess v. Hartford Life & Accident Ins. Co.*, 274 F.3d 456, 461 (7th Cir. 2001) (deciding, in an ERISA case, that the applicable standard of review was the one found in Rule 52(a), where the parties stipulated to the facts that made up the administrative

-15-

record, and the "procedure the parties followed . . . [was] more akin to a bench trial than to a summary judgment ruling"); *see also Crespo v. Unum Life Ins. Co. of America*, 294 F. Supp. 2d 980, 991 (N.D. Ill. 2003) (discussing the "problem of reviewing ERISA benefit claims on cross-motions for summary judgment" and strongly suggesting that "parties consider proceeding by means of a trial on the papers under" Rule 52(a)).

## I.   Claim for Benefits under ERISA

At the outset, the Court must determine what standard of review to apply in reviewing UNUM's decision to deny plaintiff's claim for LTD benefits.  Predictably, plaintiff requests *de novo* review, while UNUM argues that the deferential arbitrary and capricious standard should apply.  The Certificate Section of the Policy states that the administrator has "discretionary authority to determine your eligibility for benefits."  While this language does not precisely mirror the "safe harbor" language of *Herzberger v. Standard Ins. Co.*, 205 F.3d 327, 331 (7th Cir. 2000), it would normally be sufficient to confer discretionary authority upon the plan administrator.  *See, e.g., Winters v. UNUM Life Ins. Co. of America*, Case No. 01-C-569-C, 2002 WL 31557505, *2 (W.D. Wis. February 21, 2002 ) (construing identical language).

However, the Policy itself contains language that has been held *not* to confer discretionary authority.  The Policy states that an LTD claimant is disabled "when UNUM determines" that the claimant meets the definition of disability.  (PPFF, ¶ 15).  This (or similar) language has been found insufficient to confer discretion in a number of cases.  *See, e.g., Herzberger*, 205 F.3d at 331 (exact same language); *Bolden v. UNUM Life Ins. Co. of*

*America*, Case No. 02-C-6701, 2003 WL 921764, *3 (N.D. Ill. March 6, 2003 ) (exact same language).

Therefore, the Policy and the Certificate of Coverage are in conflict. The general rule is that the Policy language governs, unless the plaintiff relied on the Certificate to her detriment (not the case here). *See Schwartz v. Prudential Ins. Co. of America*, 450 F.3d 697, 699 (7th Cir. 2006) (when "the plan and the summary plan description [or Certificate of Coverage] conflict, the former governs, being more complete – the original, as it were . . .") (quoting *Health Cost Controls of Illinois, Inc. v. Washington*, 187 F.3d 703, 711 (7th Cir. 1999)). After all, "ambiguities in insurance policies are construed against the insurer." *Schwartz*, 450 F.3d at 699 (citing *Ruttenberg v. U.S. Life Ins. Co.*, 413 F.3d 652 (7th Cir. 2005)).

UNUM argues that the discretionary language in the Certificate is effective because it is specifically incorporated into and made a part of the policy. *See* Docket # 18, Exhibit A to Affidavit of Holly Harwell, UACL 0203 ("This policy consists of: all policy provisions . . . and the certificate of coverage"). UNUM cites *Shyman v. UNUM Life Ins. Co.*, 427 F.3d 452, 455 (7th Cir. 2005),[2] which held that discretionary language in a Certificate is effective when the package of documents declares that the Certificate is part of the Policy. However, in *Shyman*, it was undisputed that the discretion-granting language *did not* contradict any other clause of any other document. *Shyman*, 427 F.3d at 455. Therefore, the rule in *Shyman* does not control the case at bar.

---

[2] At the time this case was briefed, UNUM cited the district court opinion, *Shyman v. UNUM Life Ins. Co. of America*, Case No. 01-C-7366, 2004 WL 609280 (N.D. Ill. March 25, 2004).

Furthermore, the Certificate also provides that if the "terms and provisions of the certificate of coverage (issued to you) are *different* from the policy (issued to the policyholder), the policy will govern." (PPFF, ¶ 17) (emphasis added). Aside from being in conflict with the Policy, the discretionary language in the Certificate regarding eligibility for benefits is, at a minimum, different from the eligibility language in the Policy. *See Bolden*, 2003 WL 921764 at *3 (the "Certificate itself contains language that causes the Policy language to trump the Certificate language: 'if the terms and provisions of the certificate of coverage (issued to you) are different from the policy (issued to the policyholder), the policy will govern'"). Therefore, the Policy language governs, and UNUM's decision to deny benefits is subject to *de novo* review.

Applying this standard of review, the Court must decide whether Lehman was disabled and entitled to benefits under the policy. Under the *de novo* standard, the Court makes an independent decision as to the claimant's eligibility for disability benefits under the policy, without deference to the administrator. *See Wallace v. Reliance Standard Life Ins. Co.*, 318 F.3d 723, 723 (7th Cir. 2003). Put another way, the Court must decide whether the decision to deny plaintiff's claim for long term disability benefits under the Policy was correct. *See Olson v. Comfort Systems USA Short Term Disability Plan*, 407 F. Supp. 2d 995, 1009 (W.D. Wis. 2005) (citing *Wilczynski v. Kemper Nat'l Ins. Cos.*, 178 F.3d 933, 935 (7th Cir. 1999)).

Under the Policy, a claimant is disabled if she is "**limited** from performing the **material and substantial duties** of [her] **regular occupation** due to . . . **sickness or injury**

-18-

. . ." (PPFF, ¶ 15) (emphasis in original). "Material and substantial duties" are duties that "are normally required for the performance of [claimant's] regular occupation[, and which] cannot be reasonably omitted or modified . . ." (PPFF, ¶ 19). Plaintiff cites the following evidence in support of her claim that she was disabled under the Policy: (1) Ms. Lehman had been out of work prior to February 6, 2001 due to her RA; (2) Dr. Pearson's statement in April 2001 that Ms. Lehman was doing very poorly and had been unable to work for the past three months (since January 2001); (3) Dr. Cool's statement that Ms. Lehman had been unable to work since February 5, 2001 due to her disability; (4) Dr. Pearson's statement on November 26, 2001 that Ms. Lehman had been disabled for the previous twelve months; and (5) Dr. Pearson's letter dated April 12, 2002 stating unequivocally that Ms. Lehman was disabled.

Ms. Lehman has substantiated her diagnosis of Rheumatoid Arthritis and Fibromyalgia. However, the evidence in the record (included the evidence emphasized by the plaintiff) does little to substantiate her claim that she was *disabled* under the terms of the Policy, *i.e.*, that she was limited from performing the material and substantial duties of her job. *See, e.g., Comfort Systems*, 407 F. Supp. 2d at 1012 (discounting evidence of symptoms that contained no analysis regarding material and substantial duties of the job). For example, Dr. Pearson's April 2001 statement that Ms. Lehman was "doing poorly" and "unable to work for the past three months" is conclusory and does not contain any analysis or explanation why plaintiff's symptoms preclude her from performing the material and substantial duties of her job. *See* PPFF ¶ 58, UACL 00017. The same can be said for the

Case 2:03-cv-00234-RTR   Filed 09/26/06   Page 19 of 23   Document 41

remainder of the evidence cited by the plaintiff. *See* PPFF ¶ 65, UACL 00046 (Dr. Cool's Physician Statement – plaintiff unable to work since 2/5/01); PPFF ¶ 108, UACL 000118-19 (Dr. Pearson's 11/26/01 statement – plaintiff unable to work for last year); PPFF ¶ 128, UACL 00149 (Dr. Pearson's 4/12/02 letter – plaintiff disabled from seeking gainful employment). Furthermore, the fact that Ms. Lehman missed time (in December 2001) prior to her final day of work (in February 2001) does not equate with her being "disabled" under the terms of the Policy.

On the other hand, evidence in the administrative record favors the finding that plaintiff is not disabled under the Policy. UNUM received information about plaintiff's occupational duties and concluded that her job was primarily sedentary with frequent lifting and moving up to 20 pounds. (DPFF, ¶ 31). An in-house physician, Dr. Beecher, reviewed the medical records and concluded that there is "no medical (physical) condition documented to support any impairment." (PPFF, ¶ 86). On or about the time plaintiff left work, her treating physicians failed to place any contemporaneous restrictions and limitations on her ability to work. (DPFF, ¶ 32). On review (first appeal), Registered Nurse Brenda Nunn concluded that plaintiff's medical records did not contradict Dr. Beecher's previous conclusion that plaintiff's restrictions and limitations were not so severe as to preclude her from sedentary and light activities in February 2001. (DPFF, ¶ 35). On further review (second appeal), Ms. Nunn rejected Dr. Pearson's limitations (from his 11/26/01 RFC Questionnaire) because they were not supported by contemporaneous Office Visit Notes. (PPFF, ¶¶ 115, 117). This conclusion was affirmed by Dr. Tony Hill, UNUM's

Vice-President and Associate Medical Director. (PPFF, ¶ 121-22). On final review (third appeal), Ms. Lehman's file was again reviewed by Ms. Nunn and Dr. Hill. Despite Dr. Pearson's April 12, 2002 letter stating that he felt Ms. Lehman was disabled from seeking gainful employment, neither altered their conclusion that Ms. Lehman did not meet the definition of Total Disability in the Policy. (PPFF, ¶¶ 134-35).

Plaintiff discounts the qualifications of Dr. Beecher, Dr. Hill, and Ms. Nunn (R.N.) in favor of her treating physicians. The Court finds that the qualifications of these individuals are sufficient to credit their opinions regarding the medical evidence in this case. The fact that Dr. Pearson is a board certified Rheumatologist does not overcome the fact that Dr. Pearson failed to provide any meaningful analysis regarding the material and substantial duties of Ms. Lehman's job. Plaintiff also criticizes UNUM's failure to obtain an Independent Medical Exam (IME). There is no obligation under ERISA to obtain an IME, especially where the medical evidence provided is insufficient to establish that plaintiff is unable to work. *See Wallace*, 318 F.3d at 724.

Therefore, the Court finds that UNUM correctly denied Ms. Lehman's claim for disability benefits under the Policy.[3]

---

[3] Plaintiff also alleged a claim for an injunction preventing the termination of benefits without further court orders. *See* Amended Complaint, Count IV, ¶ 40. Given the Court's holding that Ms. Lehman is not entitled to disability benefits, this claim will be denied.

## II. Claim Under 29 U.S.C. § 1133: Failure to Provide Adequate Notice[4]

Lehman also alleges that UNUM violated 29 U.S.C. § 1133 and its attendant regulations by failing to provide adequate notice of an adverse benefit determination. Even if UNUM committed procedural violations, Ms. Lehman's relief would be procedural, not substantive. *See Wolfe v. J.C. Penney Co., Inc.*, 710 F.2d 388, 393-94 (7th Cir. 1983) (where denial letter is insufficient to satisfy § 1133, the claimant "is not entitled to a substantive remedy," but rather remand to the administrator for a determination based upon her supplementation of the record in response to proper notice of denial). Ms. Lehman is foreclosed from obtaining such relief by virtue of the Court's *de novo* determination that UNUM's denial of benefits was correct. *See Fischman v. Blue Cross & Blue Shield of Connecticut, Inc.*, 775 F. Supp. 513, 517 (D. Conn. 1991) (plaintiff cites no authority for an award for procedural violations alone where the plan fiduciary's ultimate decision was correct); *Hamilton v. Mecca, Inc.*, 930 F. Supp. 1540 (S.D. Ga. 1996) (where plan administrator has failed to comply with ERISA's procedural guidelines under 29 U.S.C. § 1133, proper course of action for the court is remand to plan administrator for full and fair review; where resolution of participant's underlying claim is clear, however, remand is unnecessary).

---

[4] This claim is alleged in the complaint as a "Breach of Fiduciary Duty" Claim. *See* Amended Complaint, Count III, ¶ 31. Plaintiff also alleges various other "Breach of Fiduciary Duty" Claims in the Amended Complaint. *See* Amended Complaint, Count III, ¶ 30; Count II, ¶¶ 25-27. These claims are not articulated in the briefing to the Court, so the Court will consider them abandoned by the plaintiff.

### III. Common Law Claims

Plaintiff has alleged common law claims for breach of contract (Count V) and declaratory relief (Count VI). Once again, plaintiff has not articulated any basis for recovery under these claims, so the Court considers them abandoned. In any event, these claims are preempted by ERISA. *See Pilot Life Ins. Co. v. Dedeaux*, 481 U.S. 53, 57 (1987); *Collins v. Ralston Purina Co.*, 147 F.3d 592, 595 (7th Cir. 1998) (state law breach of contract claim preempted when it requires the court to interpret or to apply the terms of an ERISA plan).

**NOW, THEREFORE, BASED ON THE FOREGOING, IT IS HEREBY ORDERED THAT:**

1. Judgment shall be entered in favor of the defendant, UNUM Life Insurance Company; and

2. This matter is **DISMISSED** in its entirety.

Dated at Milwaukee, Wisconsin, this 26th day of September, 2006.

**SO ORDERED,**

**s/Rudolph T. Randa**
**HON. RUDOLPH T. RANDA**
**Chief Judge**

-23-